# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MATTHEW BRACKEN,                                      CASE NO.: 1:12-CV-892

        Plaintiff,                               Judge Michael R. Barrett

        v.

DASCO HOME MEDICAL EQUIPMENT,
INC., *et al.*,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendant DASCO Home Medical Equipment, Inc.'s

Motion for Summary Judgment.  (Doc. 51).[1]  Plaintiff Matthew Bracken filed a memorandum in

opposition (Doc. 59), and Defendant filed a reply (Doc. 67).  This matter is now ripe for review.

## I.  FACTUAL OVERVIEW

The following are the basic facts of the case, as construed in favor of Plaintiff.

Defendant is a company that provides home equipment for a wide range of medical uses,

and specializes in equipment such as oxygen, wheelchairs, and hospital beds.  (Doc. 51, PageID

534).  Rachel Mazur, who is the Chief Executive Officer of Defendant, owns the company along

with her brother, Jason Seeley.  (*Id.*).  At the times relevant to this lawsuit, Kim Crum was the

---

[1] Defendant's motion exceeds this Court's page limitations by 10 pages, and no leave of Court has been
sought or granted.  Local Rule 7.1 sets forth the preference of the Court that memorandum not exceed twenty pages
and indicates that a judge "may impose page limitations in any action by standing order."  S.D. Ohio Civ. R. 7.1.
The Standing Order governing the civil trials of the undersigned provides that motions "shall not exceed twenty
pages without first obtaining leave of court."  Similarly, the Calendar Orders in this case refer counsel to the
Standing Orders and state that the "Court will not read beyond 20 pages unless leave has previously been sought and
granted."  (*See* Docs. 18, 31, 46).  Plaintiff points out Defendant's failure to comply in his memorandum in
opposition.  (Doc. 59, PageID 668).  Defendant offers no response or explanation for its plain failure to comply.
(*See generally* Doc. 67).

Director of Risk and Reimbursement and Jeff Blunt was the Chief Financial Officer.  (Doc. 64, PageID 1411; Doc. 62, PageID 1106, 1121).

Plaintiff began working for Defendant as an independent contractor in early August 2009. (Doc. 49-1, PageID 322).  Around December 1, 2009, Plaintiff became a full-time employee of Defendant, working as the Director of Operations and reporting to Mazur.  (Doc. 49-1, PageID 322-24, 383-84; Doc. 51, PageID 534).  When he interviewed for the position, Plaintiff did not say anything about having a disability or about needing an accommodation to perform his job. (Doc. 51, PageID 534-35).  Plaintiff testified that prior to 2009 he had not seen a psychologist, psychiatrist, or any type of counselor for any condition.  (Doc. 49-1, PageID 323).

In his position as Director of Operations, Plaintiff had several responsibilities.  (Doc. 49-1, PageID 324).  First, he oversaw the healthcare professionals and the delivery technicians. (Doc. 49-1, PageID 324).  Second, he assisted in providing strategy for Defendant to help ensure it was financially accomplishing its goals and directives.  (Doc. 49-1, PageID 324).  Finally, Plaintiff "was to be a change agent for the organization, to make changes across the branches that were sorely needed."  (Doc. 49-1, PageID 324).  Mazur identified Plaintiff's strengths as being a "visionary," challenging the norm, and being "passionate."  (Doc. 63, PageID 1342).

During the period between approximately December 1, 2009 and June 29, 2010, Plaintiff had some sleeping issues that arose from a shoulder surgery as well as at least one interpersonal problem.  (Doc. 49-1, PageID 355-56, 375).  On or about April 20, 2010, Plaintiff had an argument with the assistant sales manager, Dustin Cook, during a meeting.  (Doc. 49-1, PageID 355-56; Doc. 51, PageID 535).  During that meeting, Plaintiff told Cook he was deflecting lack of sales numbers and pointing at operations behind his back to Mazur and Seeley.  (Doc. 49-1, PageID 356).  Cook began yelling at Plaintiff, and Plaintiff responded by screaming at Cook.

(Doc. 49-1, PageID 356).  Plaintiff testified that he knew his behavior was not appropriate, and he apologized to Cook shortly thereafter.  (Doc. 49-1, PageID 358-59).  Plaintiff also had butted heads on occasion with Josh Howe and Dawn Tyree.  (Doc. 49-1, PageID 367).  According to Mazur, Plaintiff also was the subject of a complaint from a facilitator on or about April 21, 2010. (Doc. 51, PageID 535).  The facilitator complained that Plaintiff would not listen or accept feedback.  (*Id.*).  Plaintiff avers that Mazur did not tell him about any such complaint and denies that any such incident occurred.  (Doc. 59-1, PageID 681).

Also occurring in early to mid-2010 was an audit by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").  (Doc. 51, PageID 601; Doc. 59-1, PageID 678).  Although Defendant had been accredited with JCAHO since the 1980s, the audit was conducted for purposes of accreditation of Defendant's new joint venture facility in Dover, Ohio.  (Doc. 51, PageID 601).  Around that time, new rules had been implemented that required accreditation for each facility.  (Doc. 51, PageID 601).  Before the Dover facility had been accredited by JCAHO, had enrolled in the Medicare reimbursement programs, or had obtained the requisite supplier or billing number, it was billing Medicare under the number of a different location.  (Doc. 51, PageID 601-02; Doc. 59-1, PageID 678).  Plaintiff had been told by Brooke Martin, the Dover Branch Manager who reported to him, that Crum had instructed her to mislead JCAHO by telling JCAHO that the Dover facility was using the Medicare supplier number of another of Defendant's joint ventures in Alliance, Ohio because the Alliance management was overseeing the Dover operation, even though Alliance management was not overseeing the Dover operation.  (Doc. 59-1, PageID 678-79).  Plaintiff then spoke to an inspector during the audit process, explaining the distinction between Defendant and the Dover Joint Venture and informing the inspector that the Dover Joint Venture was billing under an incorrect Medicare

supplier number.   (Doc. 49-1, PageID 486; Doc. 59-1, PageID 679).   Defendant ultimately refunded Medicare for the Dover facility claims, which totaled less than $10,000.   (Doc. 51, PageID 602; Doc. 67-3, PageID 1498).   Defendant then obtained a new billing number for the Dover facility.  (Doc. 51, PageID 602).   No subsequent FCA or other action or investigation was taken against Defendant relating to the Dover billing incident.   (Doc. 51, PageID 602). Afterwards, Mazur told Plaintiff he had said too much to the investigator.  (Doc. 49-1, PageID 486).[2]   Plaintiff then consulted a Medicare attorney, but he did not tell Mazur that he did so. (Doc. 49-1, PageID 484-86).

During the next six months (between June 30, 2010 and December 31, 2010), Plaintiff had increased difficulties.  Plaintiff testified that he was not sleeping well, as he would go three or four nights where he would barely sleep and then would sleep too much on other nights. (Doc. 49-1, PageID 374, 376).  He further testified that his emotions at that time were "not where [he] want[ed] them to be."   (Doc. 49-1, PageID 374).   Plaintiff told his management team, including Mazur and Seeley, on a couple of occasions (more than two) during management meetings that he was not sleeping well, and "going crazy."   (Doc. 49-1, PageID 376-77).   He testified though that those were one-off comments rather than sit-down conversations about the problems he was experiencing, and he did not tell them that he was having mood swings.  (Doc. 49-1, PageID 383, 385).  At no time did Plaintiff request any time off from work.  (Doc. 49-1, PageID 378-79).

Plaintiff had some issues with co-workers during this time period as well.  One person in particular with whom he had problems was Jamie Hawkins, a branch manager that reported to

---

[2] Mazur contends she told Plaintiff the way he handled the discussion with the inspector was inappropriate. (Doc. 63, PageID 1273-74).

Plaintiff for a period of time. (Doc. 49-1, PageID 380-81; Doc. 51, PageID 535).[3] Although he was never told he had inappropriate conversations with her, he had told Hawkins that she meddled in things that were not her business. (Doc. 49-1, PageID 380-81). He informed Kim Crum and Jeff Blunt about the conversation he had with Hawkins, and later also had a conversation about it with Mazur and Seeley. (Doc. 49-1, PageID 383).[4] Although Mazur characterizes Plaintiff's behavior as "aggressive" and "inappropriate," Plaintiff avers that he and Mazur had an in-person conversation with Hawkins where they informed Hawkins that they were dissatisfied with her performance. (Doc. 51, PageID 535; Doc. 59-1, PageID 682).

Plaintiff and Mazur also had a discussion on one occasion about branch compliance issues that were brought to Mazur's attention by Terri Gold. (Doc. 49-1, PageID 402-03; Doc. 51, PageID 536). Plaintiff testified that Mazur wanted to pass along information, but did not discuss the issue as a complaint or in terms of inappropriate behavior. (Doc. 49-1, PageID 401-03).[5] Plaintiff denies that Mazur ever warned him about his behavior during the meeting. (Doc. 59-1, PageID 682).

In or around September 2010, Plaintiff and Mazur had weekly meetings in which Mazur reduced her observations into notes. (Doc. 63, PageID 1259-61; Doc. 63-6, PageID 1393; Doc. 63-7, PageID 1394-95; Doc. 63-8, PageID 1396-97). In her notes, Mazur identified Plaintiff's "pros" as 1) "[s]trategic thinking/pushing," 2) "centraliz[ing] customer service . . . reducing head count," 3) "bold new ideas/challenge the norm," 4) "raise the bar/performance of the sr team," 5)

---

[3] Plaintiff did not specify when this incident occurred. Mazur avers that the incident occurred on or about September 8, 2010. (Doc. 51, PageID 535).

[4] Mazur's notes characterize this interaction differently. (Doc. 63-7, PageID 1394-95).

[5] Plaintiff did not specifically identify when this incident occurred. Mazur avers that it occurred in December 2010. (Doc. 51, PageID 536). Contrary to Plaintiff's representation, Mazur avers that the Compliance Manager reported several issues with Plaintiff during that time, including that Plaintiff was aggressive and stormed out of a meeting with him, that he was unresponsive and unprofessional about an issue raised to him about lack of compliance in one of his branches, and that he was unresponsive to complete compliance tasks at the branches. (Doc. 51, PageID 536).

5

"awesome intentions/commitment to DASCO," 6) "empowerment & development of several Branch Managers," 7) able to make tough terminations, 8) able to deal with turmoil, and 9) his loyalty and commitment.  (Doc. 63, PageID 1264-65; Doc. 36-6, PageID 1393; Doc. 63-8, PageID 1396).  Mazur identified one of his "cons" as 1) "[d]iarrhea of mouth" that negatively impacted DASCO.  (Doc. 63, PageID 1267-6; Doc. 63-6, PageID 1393).  She elaborated on that with notes that Defendant did not want him talking to a surveyor/inspector on JCAHO in Dover, that Seeley and Mazur "both avoid him [because] we don't want a 1 hour conversation," and that a sales representative commented on the length of a phone call with Plaintiff.  (Doc. 63-6, PageID 1393).  She also identified other "cons," including 1) "offending others by getting too personal," 2) requiring others to spend time resolving his conflicts and to spend money on coaching, and 3) that she was "[f]rustrated about talking about hours worked[.]" (Doc. 63-6, PageID 1393).  In another document, Mazur expanded upon the "cons," explaining that Plaintiff "[o]ver-communicat[es] without purpose[,]" is "[n]ot listening," is "[a]ggressive," and fails to follow "proper channels of communication[.]"  (Doc. 63-7, PageID 1395).  Mazur indicated that the "outcomes" were to have weekly one-hour meetings, have Mazur communicate frustration and criticism more timely, and have Plaintiff work on the above issues.  (Doc. 63-7, PageID 1395).  Mazur characterized her notes as a "written warning" about aggressiveness and ego. (Doc. 51, PageID 536).  Mazur's notes indicate she discussed some of the issues with Plaintiff on September 22, 2010, while Plaintiff avers he did not receive the "written warning" and that the notes did not satisfy the definition of written warning as set forth in the handbook and as testified to by Mazur.  (Doc. 59-1, PageID 679; Doc. 63, PageID 1348-50; Doc. 63-6, PageID 1393).

Around October 2010, Mazur told Plaintiff that he needed to meet with their coach, Norman Shub. (Doc. 49-1, PageID 392).[6] Prior to the first meeting with Shub, Plaintiff had never met with a professional coach; however, other executives of Defendant, including Mazur, Seeley, Blunt and Crum, all had met with a professional coach during their employment at Defendant. (Doc. 49-1, PageID 392; Doc. 62, PageID 1126-28). During an early meeting (possibly the first meeting), Mazur and Seeley expressed dissatisfaction with how Plaintiff was handling things at work at that time. (Doc. 49-1, PageID 398). Mazur "started rifling off all these things that [Plaintiff] wasn't very good at and all these things that [he] had done." (Doc. 49-1, PageID 393-94). Among those things she mentioned was the argument with Cook, which she said was inappropriate and which Plaintiff admits was inappropriate. (Doc. 49-1, PageID 394-95, 397). On this occasion, Seeley told Plaintiff he did not think he was "a fit for the company." (Doc. 49-1, PageID 394; Doc. 51, PageID 536). Seeley testified that he reiterated to Mazur more than fifty times during Plaintiff's employment that he did not think Plaintiff was a good fit but that Mazur wanted to give him more time because he was "good for the culture." (Doc. 67-2, PageID 1488; Doc. 62, PageID 1114-15). Plaintiff testified that he cried during this meeting while Mazur and Seeley were present. (Doc. 49-1, PageID 384).

Plaintiff met with Shub a total of three times. (Doc. 49-1, PageID 399). He also met with another individual from Shub's organization approximately twelve to fifteen times. (Doc. 49-1, PageID 400). While Plaintiff viewed the coaching as an opportunity to learn and believed it showed that the company was investing in him, he had a difficult time getting used to receiving constructive criticism. (Doc. 49-1, PageID 410-11). In late 2010 or early 2011 during a

---

[6] The exact dates are not clear. Mazur avers that this incident occurred on September 20, 2010. (Doc. 51, PageID 536). She also avers that the first counseling occurred in April 2010, and that Defendant arranged for counseling beginning in April 2010 "because of the issues" described in her affidavit, even though all except two of the incidents described occurred after April 2010. (Doc. 51, PageID 538).

7

coaching session, Seeley told Plaintiff "You've done everything we've asked you through these coaching sessions to do."  (Doc. 49-1, PageID 411, 426).  Mazur agreed with Seeley, and Shub said to Plaintiff, "I'm proud of you."  (Doc. 49-1, PageID 411, 427).

In late 2010, Plaintiff recalled having lunch with Mazur during which she told him that he "hit a home run for us this year with all the changes that you made."  (Doc. 49-1, PageID 405). Although Mazur's comment made him believe he was doing his job well, he felt he could do some things better such as building a better team by getting along with some of the employees better.  (Doc. 49-1, PageID 406-07).

On one occasion at the end of 2010, Mazur told Plaintiff to get out of the office and go home because he looked stressed out and had too much going on.  (Doc. 49-1, PageID 378-79; Doc. 63, PageID 1285).  He explained that she had observed he had mood swings, was stressed out, was short with others, and was impatient.  (Doc. 49-1, PageID 379).  Plaintiff testified that he cried on this occasion with Mazur present.  (Doc. 49-1, PageID 384).

During the first six months of 2011, Plaintiff continued to have problems sleeping and experienced mood swings.  (Doc. 49-1, PageID 419).  While he made some one-off comments to those with whom he worked, he was not seeing a physician at this time for any issues he was experiencing.  (Doc. 49-1, PageID 419-21).[7]  He testified that his issues did not prevent him from doing his job and that things had gotten better.  (Doc. 49-1, PageID 420-21).  During this time, Mazur avers that she received multiple complaints about Plaintiff's behavior.  (Doc. 51, PageID 537).  Some of those complaints were from the Compliance Manager regarding Plaintiff's lack of response or inappropriate response to requests for improvement in branches. (Doc. 51, PageID 536-37).  One complaint was from a referral in regards to Plaintiff belittling

---

[7] Mazur avers that Plaintiff never informed him or anyone else employed by Defendant that he was disabled or had any type of disability.  (Doc. 51, PageID 539).

her concerns and not taking care of an issue, while another complaint was from an anonymous source about Plaintiff being condescending towards an employee and about several women being scared of Plaintiff.  (Doc. 51, PageID 537).  It is not clear whether or to what extent Plaintiff was made aware of any of those complaints.  (Doc. 51, PageID 536-37; Doc. 59-1, PageID 679-80; Doc. 59-1, PageID 682).

Around August 2011, Plaintiff had a conversation with Seeley and Mazur where they indicated they wanted Plaintiff to take over the sales team in addition to his duties as the director of operations because they were not satisfied with Cook's performance in his sales position. (Doc. 49-1, PageID 412-13).[8]   In the sales position, Plaintiff would have had approximately ten individuals reporting to him.  (Doc. 49-1, PageID 414).  In his position as Director of Operations, he had five individuals reporting to him.  (Doc. 49-1, PageID 414-15).  Plaintiff believed that he could perform both roles, acting essentially as a chief operating officer.  (Doc. 49-1, PageID 434).

Following his conversation with Seeley and Mazur, Plaintiff prepared a short outline of the personnel process, the value proposition, and how Defendant could position itself in the marketplace.  (Doc. 49-1, PageID 431-32).  Plaintiff presented that information to Seeley and Mazur over drinks in the August to September timeframe.  (Doc. 49-1, PageID 431).  Plaintiff did not discuss with Seeley or Mazur what his compensation should have been for the new role. (Doc. 49-1, PageID 432).

---

[8] Defendant disagrees with Plaintiff's characterization of this conversation, contending that it was a demotion to a sales only position where he would be managing approximately 10 people rather than approximately 80 people.  (Doc. 51, PageID 537; Doc. 63, PageID 1337-40).  Mazur avers that Plaintiff would not accept the demotion, and told Crum that he was worth about $200,000 per year, but Defendant was not willing to pay him that to manage sales.  (Doc. 51, PageID 537).  Plaintiff avers, however, that he never refused to assume that role.  (Doc. 59-1, PageID 680).

Early in September 2011, Mazur avers that Plaintiff sent an inappropriate email to Crum stating about the Sales Manager "if you only knew how mismanaged our JVs are and were it'd make you sick to your stomach" and about the Patient Care Manager "if she spent more time selling and less time telling the CCC's what, where, when and how to do their jobs she might sell more."  (Doc. 51, PageID 538).   Other complaints Mazur purports to have received concern Plaintiff making inappropriate comments to woman, and Plaintiff referring to an employee who walked with a limp as "peg leg."  (Doc. 51, PageID 537).[9]

On or about September 23, 2011, Plaintiff's wife was involved in an incident where she was driving intoxicated with their son in the vehicle.  (Doc. 49-1, PageID 446).  The next morning, Plaintiff's wife told him she wanted out of the marriage.  (Doc. 49-1, PageID 446).  On October 7, 2014, Plaintiff visited his family practitioner because he was unable to eat after the situation with his wife and he was unable to sleep.  (Doc. 49-1, PageID 449-51).  This was the first time Plaintiff had seen anyone for his problems.  (Doc. 49-1 PageID 450).  During that visit, his physician indicated that Plaintiff had "[p]oor sleep and appetite and with weight loss[,]" was "[a]nxious[,]" had "poor concentration[,]" had "multiple stressors[,]" was "[v]ery irritable with family/friends," and was "[m]oody with anhedonia[.]"   (Doc. 49-2, PageID 491).[10]   His physician further indicated that "[d]uration is longer than 6 months[.]"  (Doc. 49-2, PageID 491).  Plaintiff's physician diagnosed Plaintiff with a "mood disorder" and prescribed him Citalopram.  (Doc. 49-1, PageID 461-62; Doc. 49-2, PageID 492).  Plaintiff was to return for a follow-up visit in a month.  (Doc. 49-1, PageID 444, 453, 456; Doc. 49-2, PageID 493).

---

[9] Plaintiff does not dispute that he called someone "peg leg" as a joke, but he denies having ever massaged any woman's shoulders at work as claimed by Defendant.  (Doc. 49-1, PageID 352-53).

[10] Stedman's Medical Dictionary, 23060 (27th ed. 2000), defines "anhedonia" as the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable."  It also defines "major depression" as a "mental disorder characterized by sustained depression of mood, *anhedonia*, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness."  Stedman's Medical Dictionary, 107140 (27th ed. 2000).

On or about October 10 or 11, 2011, Plaintiff informed Crum and Blunt about his depression and anxiety, although not about the incident with his wife. (Doc. 49-1, PageID 443-46). Although they were not his supervisors, Mazur was out of town at the time and they were in the middle of a software implementation for which Plaintiff believed the information may have been important to explain any shortcomings in his performance. (Doc. 49-1, PageID 445-48). Crum doubted that Plaintiff actually had been diagnosed with depression, and she thought his disclosure seemed like an "excuse for him not to do his job." (Doc. 64, PageID 1414).

Shortly thereafter, Plaintiff informed Mazur of his health issues, including his lack of sleep, his depression and anxiety, and his significant weight loss, indicating to her that he thought it may explain his past interpersonal issues. (Doc. 49-1, PageID 440).[11] Plaintiff told Mazur that he was starting to feel better. (Doc. 49-1, PageID 441; Doc. 51, PageID 539; Doc. 67-3, PageID 1501). Mazur then indicated to Plaintiff that she had some issues with anxiety in the past and that they were there to support Plaintiff. (Doc. 49-1, PageID 441).[12] Plaintiff never told Mazur he was "disabled," never asked for a different schedule, and never asked for time off work. (Doc. 49-1, PageID 443; Doc. 51, PageID 539).

Around that time in October, Mazur avers that she received a complaint from Crum that Plaintiff's lack of listening, style and demeaning conversations were becoming intolerable and that she had received complaints from eight women in the office about him. (Doc. 51, PageID 538). Mazur also avers that she received a complaint from one of Plaintiff's direct reports about her frustrations with Plaintiff, and from the CFO regarding Plaintiff's performance and style.

---

[11] Mazur avers that Plaintiff "mentioned he had begun taking medication" but did not tell her he had been diagnosed as having any kind of mental illness. (Doc. 51, PageID 539). She assumed, however, that he was taking medication for either mental or emotional problems. (Doc. 67-3, PageID 1501).

[12] Mazur testified that she did not have any such issues but she empathized with Plaintiff. (Doc. 67-3, PageID 1501).

(Doc. 51, PageID 538; *see also* Doc. 52, PageID 1121).   There is no indication that these complaints were relayed to Plaintiff or that they resulted in any type of discipline by Defendant.

On or about October 27, 2011, Mazur contends that Plaintiff was notified by Defendant's Compliance Officer to keep the offices open during the thirty hours per week required by Medicare.  (Doc. 51, PageID 538).  Plaintiff, however, allowed branch staff to close their offices and told at least one branch employee not to tell others when it was closed.  (Doc. 51, PageID 538).

In early November 2011, Mazur told Plaintiff that he was not a good fit for the company and Plaintiff recommended speaking with Shub.  (Doc. 49-1, PageID 422, 435; Doc. 51, PageID 538).  Plaintiff requested additional coaching to improve.  (Doc. 51, PageID 538).  During the meeting with Shub, Mazur did not identify any specific problems that made her believe Plaintiff was not a good fit, and she told Shub that Plaintiff was doing things that she and Seeley could not do and that he was doing what they wanted him to do from an interpersonal standpoint. (Doc. 49-1, PageID 436).  During that meeting, Plaintiff mentioned his mental health issues for which he had recently visited his physician and which he believed may explain his prior interpersonal issues.  (Doc. 49-1, PageID 437).  In response, Mazur "sneered and snickered." (Doc. 49-1, PageID 437).  According to Mazur, Shub agreed during that meeting that Plaintiff was not a good fit for Defendant.  (Doc. 51, PageID 538; Doc. 67-2, PageID 1492).  Plaintiff avers, however, that Shub recommended that he remain employed by Defendant and assured Mazur that everything would be fine.  (Doc. 59-1, PageID 681).

On November 21, 2011, Plaintiff re-visited his physician.  (Doc. 49-1, PageID 460). Plaintiff informed his physician that he was feeling better but still was having some emotional problems.  (Doc. 49-1, PageID 460).  His physician indicated that the current therapy was

12

controlling the symptoms and he increased the dosage of his prescription.  (Doc. 49-1, PageID 461; Doc. 49-2, PageID 496).  The physician requested follow up in six months.  (Doc. 49-2, PageID 497).

On November 29, 2011, Plaintiff was terminated by Defendant.  (Doc. 49-1, PageID 421).  The "Reason for Discharge" provided on his "Discharge Notice Form" is as follows: "Culture Fit/Style Issues w[ith] Others" and "Continued Issues with Style/Communication [with] Associates at DASCO . . . ."  (Doc. 62-7, PageID 1233).  Four "prior warnings on this subject" are listed therein, which include: 1) a September 20, 2010 "written" warning regarding communication/style where Seeley, Mazur, and Plaintiff "met w[ith] Coach to work on [s]tyle w[ith] others"; 2) September 2010 to current "[c]oaching" concerning communication/style where Plaintiff attended coaching to work on the issues previously identified; 3) November 1, 2011 verbal warning on communication/style/team where "issues w[ith] the function of our Management team b[ecause] of style issues" were discussed; and 4) November 11, 2011 verbal warning where Mazur and Plaintiff met with Shub on style issues and him not being a "fit." (Doc. 62-7, PageID 1233).

Five months after his termination, Plaintiff started working at Pomeroy.  (Doc. 49-1, PageID 465).  He has not disclosed to his conditions to his new employer nor requested an accommodation.  (Doc. 49-1, PageID 465-66).

Since his termination, Plaintiff had been prescribed two additional medications: Trazadone for sleep as well Risperidone, an antipsychotic medicine for what could be bipolar disorder in addition to his depression and anxiety.  (Doc. 49-1, PageID 464; Doc. 54, PageID 634).  His sleep has improved through the use of medication.  (Doc. 49-1, PageID 474).  One physician has noted that he is "[n]egative for depression, suicidal ideas and substance abuse"

13

while also listing generalized anxiety disorder and depression in his assessment.  (Doc. 54, PageID 636-37).

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution affects the outcome of the suit.  *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The moving party has the burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson*, 477 U.S. at 249.  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III.    ANALYSIS

Defendant moves for summary judgment on Plaintiff's claims for A) disability discrimination under the Americans with Disabilities Act ("ADA") and Ohio Rev. Code § 4112.99, and B) retaliation under the False Claims Act ("FCA"). These arguments are addressed below.

## A.  Disability Discrimination under the ADA and Ohio Rev. Code § 4112.99

The ADA, as amended by the Amendments Act of 2008 ("ADAAA"),[13] prohibits employers from discriminating against qualified individuals "on the basis of disability" in regards to, among other things, the advancement or discharge of employees and other terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).[14]  In the absence of direct evidence of discrimination, courts analyze disability discrimination claims following the burden-shifting approach of *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973).  *Blazek v. City of Lakewood*, No. 13-4324, 2014 U.S. App. LEXIS 15656, at *8 (6th Cir. Aug. 13, 2014).  "'To prove a *prima facie* case of disability discrimination, a plaintiff must show that 1) he is disabled, 2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation,' and 3) a causal link ties the disability to the adverse employment action." *Id.* at *8 (quoting *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014)).  "'Once Plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a nondiscriminatory legitimate reason for the termination.  Provided that the employer meets this burden, Plaintiff must then show that the proffered reason is but a pretext for

---

[13] The effective date of the ADAAA was January 1, 2009.  Pub. L. No. 110-325 § 8, 122 Stat. 3559 (2008). As the conduct at issue here occurred after the effective date, the ADAAA applies.

[14] While the state and federal statutes may not be identical in all respects, courts generally look to the federal statute and its interpretation by federal courts for guidance in interpreting the Ohio statute when the terms of the federal statute are consistent with Ohio law or when Chapter 4112 leaves a term undefined.  *Scalia v. Aldi, Inc.*, No. 25436, 2011-Ohio-6596, 2011 Ohio App. LEXIS 5422, at *18-24 (9th Dist. Dec. 21, 2011) (citing *Genaro v. Cent. Transport*, 84 Ohio St. 3d 293 (1999)).

15

discrimination.'" *Id.* at *8-9 (quoting *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 310 (6th Cir. 2000)).

The parties dispute whether Plaintiff has presented sufficient evidence as to first and fourth prongs of the *prima facie* case and as to pretext.[15] Those issues are analyzed below.

### 1. First Prong: Disability

The ADAAA sets forth three alternative definitions of "disability": 1) a physical or mental impairment that substantially limits one or more major life activities of such individual"; 2) "a record of such an impairment"; or 3) "being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).[16] Under the ADAAA, the term "disability" is to be "construed in favor of broad coverage . . . to the maximum extent permitted by the terms" of the ADAAA. 42 U.S.C. § 12102(4)(A).

Here, Plaintiff attempts to prove disability only under the first and third definitions.

### a. Impairment that substantially limits a major life activity

There are two issues to address with respect to the first definition of disability: 1) whether Plaintiff has presented sufficient evidence of an "impairment" and 2) whether Plaintiff has presented sufficient evidence that any such impairment substantially limits a major life activity. Upon review, the Court finds Plaintiff has presented sufficient evidence on both issues to satisfy the first definition of disability at this stage.[17]

---

[15] Defendant also moves for summary judgment on any claim based on a failure to accommodate. (Doc. 51, PageID 526). Plaintiff's response does not address that issue, and therefore, any such claim is waived and need not be addressed here.

[16] Ohio law is similar, defining a "disability" as a "physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13); *see also Scalia*, 2011 Ohio App. LEXIS 5422, at *18-24.

[17] *See Mocasto v. Ohio State Univ.*, No. 2011-06552, 2013-Ohio-3631, ¶¶ 7-25, 2013 Ohio Misc. LEXIS 37, at *6-14 (Ct. Cl. Mar. 27, 2013) (evaluating Ohio and ADAAA claims concurrently).

Under 42 U.S.C. § 12102 and 29 C.F.R. § 1630.2, the impairment requirement may be satisfied by evidence of a "mental impairment."  A "mental impairment" includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness . . ."  29 C.F.R. § 1630.2(h)(2). Plaintiff has set forth evidence that he was diagnosed with a "mood disorder," was prescribed an anti-depressant for his condition, and was noted to be "moody with anhedonia."  Plaintiff also has presented evidence as to the various symptoms that led to the diagnosis and as to his subsequent prescription of an anti-psychotic medication for possible bipolar disorder following his termination from Defendant.  At this stage, such evidence is sufficient to satisfy the "impairment" requirement.

Defendant's arguments to the contrary are not well taken.  The facts that Plaintiff saw his physician only twice near the end of his employment with Defendant, that his physician never referred to his condition as a "disability," and that Plaintiff never told anyone at Defendant or his new employer that he has a "disability" are of little consequence to the finding of an impairment in the first instance.  Even if, however, those facts are of relevance to the analysis, they would, at best, create a genuine issue of material fact as to the existence of an impairment.

As for the second issue, the term "substantially limits" is not intended to be a "demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).  Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).  Also included on the list in the regulations is "interacting with others."  29 C.F.R. § 1630.2(I)(i).  In determining whether an

individual is substantially limited in a major life activity, courts may consider, among other things, the difficulty, time or effort required to perform the major life activity, the pain experienced in performing that major life activity, the length of time that major life activity can be performed, or the way the impairment affects the operation of a major bodily function. 29 C.F.R. § 1630.2(j)(4)(ii).

Plaintiff testified that he had trouble sleeping and eating over a period of more than six months, that sometimes he would hardly sleep for three or four nights and then would sleep too much at other times, that he lost a significant amount of weight, and that he had serious mood swings and was highly irritable with others.[18] Plaintiff testified that he had crying episodes and he was sent home from work by Mazur on at least one occasion because she believed he was over-worked and stressed and wanted him to re-energize. There also is evidence of record showing Plaintiff complained about his lack of sleep and that he had difficulty with interpersonal relationships at times that others at work did not experience. While his official diagnosis of a mood disorder and medication for depression came after he had been experiencing the symptoms for a while, there is at least a genuine issue of material fact as to whether the late-diagnosed impairment caused his lack of sleeping and eating, mood swings, and irritability during his employment with Defendant. Moreover, the self-described severity of Plaintiff's depression and its adverse effects on his sleeping, eating, and attitude towards others, supported by some medical evidence, would appear to be sufficient under the more lenient standard of the ADAAA

---

[18] It is noted, however, that the six-month "transitory and minor" exception to the "regarded as" coverage does not apply to the first definition of disability, and the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning" of the ADA. 29 C.F.R. § 1630.2(j)(1)(ix). (j)(2).

to at least raise a fact issue as to whether Plaintiff had an impairment that substantially limited major life activities.[19]

The Court is not persuaded otherwise by Defendant's arguments.  First, Defendant relies upon pre-ADAAA caselaw that imposed a more demanding standard for a substantial limitation. (Doc. 51, PageID 520-24).  In particular, Defendant relies upon *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), to support its argument that Plaintiff has failed to show a substantially limiting impairment.  (Doc. 51, PageID 520, 522).  Congress, however, "passed a law repudiating *Toyota's* strict standard for finding a disability under the ADA and expressing its intent that the ADA be construed in favor of broad coverage[.]"  *Jenkins v. Nat'l Bd. of Med. Examiners*, No. 08-5371, 2009 U.S. App. LEXIS 2660, at (6th Cir. Feb. 11, 2009) (citing Pub. L. No. 111-325, 122 Stat. 3553 (2008)).  Although it still is true that not every impairment constitutes a disability and an individualized assessment is necessary, Plaintiff has presented sufficient evidence, as explained previously, to satisfy his burden at this stage of showing a substantial limitation. *See* 29 C.F.R. § 1630.2(j)(ii), (iv).  As the regulations make clear:

> An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. . . .
>
> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.  Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis. . . .

---

[19] It is a "predictable assessment" under the regulations that major depressive disorder substantially limits brain function.  29 C.F.R. § 1630.2(j)(3)(iii).  While Plaintiff did not have a specific diagnosis of major depressive disorder, he was diagnosed with a "mood disorder," a category under which major depressive disorder may fall on the Diagnostic and Statistical Manual of Mental Disorders (DSM IV TR) classification systems.  In addition, Plaintiff was prescribed an anti-depressant medication and displayed anhedonia, a common symptom of major depressive disorder.

[Further,] [t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis.

29 C.F.R. § 1630.2(j)(ii), (iii), (v).

Second, Defendant's argument that a finding of non-disability is required because Plaintiff failed to show he was substantially limited in the major life activity of working misconstrues the current law.  Under the amendments to the ADA, Plaintiff need not show that his impairment limited all or several major life activities; it is enough that it limited one major life activity.  42 U.S.C. § 12102(4)(C) ("An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.").  Similarly, Plaintiff does not need to show what outcomes he could achieve despite the impairment.  29 C.F.R.§ 1630.2(j)(4)(iii) (indicating that the focus of the analysis is not on "what outcomes an individual can achieve" but on the major life activity that is substantially limited).  Thus, while evidence may suggest that his impairment did not affect his ability to work or to prompt him to request an accommodation from Defendant, that evidence does not preclude a finding that Plaintiff's impairment substantially limited him in a major life activity.

Third, Defendant's argument that Plaintiff's medication alleviates his limitations on sleeping and eating such that he cannot be found substantially limited in those activities also misconstrues the current law.  In support of its argument, Defendant relies primarily on *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83 (1999) and *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999), as well as caselaw that applies the same or that otherwise pre-dates the amendments to the ADA.  (Doc. 51, PageID 522-23; Doc. 67, PageID 1466).[20]  Nevertheless,

---

[20] For example, Plaintiff relies on *Swanson v. University of Cincinnati*, 268 F.3d 307, 315-16 (6th Cir. 2001).  In that case, the Sixth Circuit considered the plaintiff's depressive condition under the more demanding

"[t]he amendments to the ADA reject the requirement [set forth in those cases] that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures."  *Greer v. Cleveland Clinic Health Sys. — E. Region*, 503 F. App'x 422, 431 n.2 (6th Cir. 2012).  Indeed, the amendments to the ADA specifically state that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication[.]"  42 U.S.C. § 12102(4)(E).  As such, the ameliorative effects of Plaintiff's medication need not be considered and do not preclude a finding of disability.

Therefore, in light of the foregoing, the Court finds Plaintiff has presented sufficient evidence of a disability under the first definition set forth in 42 U.S.C. § 12102.

### b.  "Regarded as" disabled

To be "regarded as" as disabled, an individual must show that he has been subject to a prohibited action because of an actual or perceived physical or mental impairment "whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12101(3)(A).[21]  An individual cannot be "regarded as" disabled, however, if the impairment is "transitory and minor," with transitory meaning an actual or expected duration of six months or less.  42 U.S.C. § 12102(3)(B); *see e.g., Esparza v. Pierre Foods*, 923 F. Supp. 2d 1099, 1104 (S.D. Ohio Feb. 12, 2013).[22]

Here, there are genuine issues of material fact that preclude summary judgment on the issue of whether Plaintiff was "regarded as" disabled.  Although Defendant argues that Plaintiff

---

standards set forth in *Sutton*.  *Swanson*, 268 F.3d at 315-16.  That case thus does not persuade the Court that Plaintiff's depression cannot qualify as a disability under the amended ADA.

[21] *Roghelia v. Hopedale Mining, LLC*, No. 13HA 8, 2014-Ohio-2935, 2014 Ohio App. LEXIS 2874 (Ohio App. June 23, 2014) (citing *Scalia v. Aldi, Inc.*, No. 25436, 2011-Ohio-6596, 2011 Ohio App. LEXIS 5422, at *18-24 (9th Dist. Dec. 21, 2011) (recognizing that the ADAAA's "regarded as" standard is consistent with Ohio law).

[22] Defendant's reliance on *Wolfe v. U.S. Steel Corp.*, No.13-3852, 2014 WL 2459739, at *3 (6th Cir. June 2, 2014) is not persuasive because, unlike this case, that case was decided pre-ADAAA.

21

cannot be "regarded as" disabled because Plaintiff has not presented evidence that Defendant's decision-makers knew that Plaintiff was substantially limited in a major life activity (Doc. 51, PageID 524-25; Doc. 67, PageID 1467), that argument is not well taken.  As an initial matter, Defendant's argument misstates the law as it applies to this case.  It is not necessary under the ADAAA that Defendant perceive Plaintiff as substantially limited in a major life activity to regard him as disabled.  Thus, it is not necessary that Defendant have specific knowledge that Plaintiff was substantially limited in a major life activity for Plaintiff to show he was regarded as disabled.  To the extent that Defendant argues that its decision-makers had no knowledge of Plaintiff's impairment or any of his symptoms, there are genuine issues of material fact on that issue that are more fully discussed below.

Moreover, Plaintiff presented evidence that he had disclosed multiple symptoms to Mazur, that Mazur saw him cry at work on multiple occasions, and that Mazur observed his irritability.  Construed in his favor, Plaintiff also was the subject of unfavorable comments about his disclosure following his disclosure (although some comments may suggest a lack of belief that Plaintiff was impaired), was the purported subject of new complaints from senior management of Defendant about his intolerable behavior, style, performance and "fit" after his disclosure, was told by Mazur that he was not a "good fit" after his disclosure despite other indicators he was a valuable member of the team and doing everything he had been asked to do on an interpersonal level, and then was terminated by Defendant.  A reasonable jury thus could find that Defendant perceived Plaintiff as having a mental or an emotional impairment, even if the mental or emotional impairment did not limit or was not perceived to limit a major life activity.  Summary judgment on this basis is therefore not warranted.

## 2.  **Fourth Prong: Causation**

Defendant also contends that Plaintiff's claim fails because he has not shown that Defendant's decision-makers had the requisite knowledge of his alleged disability to establish causation.  While the ADAAA "changed the language of the Act from prohibiting discrimination 'because of' disability to discrimination 'on the basis of' disability, this does not affect the reasoning of the pre-2008 decisions with respect to decision-maker knowledge."  *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013).  "It is equally true that an employee cannot be fired 'on the basis of' his disability unless the individual firing him knows of that disability."  *Id.*  An employer "'knows' of a disability when an employee tells the employer of his or her 'condition.'"  *Hammon v. DHL Airways*, 980 F. Supp. 919, 926 (S.D. Ohio 1997), *aff'd*, 165 F.3d 441 (6th Cir 1999).  "The employer need only know the 'underlying facts' of the condition" and need not label his condition a "disability."  *Id.* (citing *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)).  "Knowledge of an employee's symptoms, however, does not necessarily equate to knowledge of his disability."  *Nilles*, 521 F. App'x at 369 (citing *Hammon*, 165 F.3d at 450; *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004)).  Yet, knowledge of severe symptoms might be sufficient to alert a decision-maker of a disabling condition or to provide at least some generalized notion that a disability existed. *Id.*

Here, Plaintiff has presented sufficient evidence from which a reasonable juror could conclude that Mazur had knowledge of his disability.  Plaintiff testified that he informed Mazur and other members of senior management on multiple occasions of his symptoms, including severe sleeplessness, and that Mazur had observed his irritability with others as well as his crying episodes.  Plaintiff also testified that approximately two months prior to his termination and before a termination decision had been made, he informed Mazur, Crum, and Blunt that he was

23

diagnosed with depression and anxiety, that he was taking medication for that condition, and that the diagnosis may explain his prior behavior.  Mazur testified that she believed Plaintiff's medication was for mental and emotional problems.

This case thus is distinguishable from *Yarberry v. Gregg Appliances, Inc.*, No. 1:12-cv-611, 2014 U.S. Dist. LEXIS 48430, at *21-26 (S.D. Ohio Apr. 8, 2014) (report and recommendation), upon which Defendant relies.  In *Yarberry*, the magistrate judge concluded that the defendant could only speculate as to the cause and duration of any impairment that the plaintiff may have suffered, which was insufficient to satisfy the knowledge requirement.  *Id.*  In reaching that conclusion, the magistrate judge recognized that the plaintiff had communicated that his behavior was due to a lack of sleep, stress from an engagement, and a recent move.  *Id.* at *25.  He also informed the defendant that he had not slept in sixteen days and needed to go to a doctor.  *Id.*  Yet, unlike in the present case, the decision to terminate the plaintiff had been made before the plaintiff informed the defendant that he had been committed to the psychiatric hospital and multiple days before any diagnosis was communicated to the defendant.  *Id.* at *28. *Yarberry* thus is not persuasive here.[23]

### 3.  Pretext

As Defendant has articulated a legitimate non-discriminatory reason for terminating Plaintiff – his "numerous documented instances of inappropriate conduct with the employees he supervised, colleagues, and others in the workplace throughout his employment" – the burden shifts back to Plaintiff to create a genuine factual dispute that Defendant's proffered justification was a pretext to mask discrimination.  Plaintiff can satisfy his burden by showing "1) that the proffered reasons had no basis in fact; 2) that the proffered reasons did not actually motivate the

---

[23]  Although Defendant argues that Plaintiff had to show that Defendant knew Plaintiff requested an accommodation for his disability prior to his termination, Plaintiff has not disputed Defendant's request for summary judgment on any failure to accommodate claim.  As such, that knowledge issue need not be addressed.

action; or 3) that they were insufficient to motivate the action." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 883 (6th Cir. 1996).

Construing the facts in the light most favorable to Plaintiff, the Court finds that there are genuine issues of material fact as to whether Defendant's reasons for discharging Plaintiff are pretextual. Without question, Defendant has put forth evidence that it had documented incidents that it believed occurred with Plaintiff and its concerns before Defendant had any knowledge of Plaintiff's diagnosis and medication use. Yet, Plaintiff has produced sufficient evidence to cast doubt on the proffered reasons for terminating him. To start, his termination was based only four "warnings." One of those four "warnings" occurred more than a year before Plaintiff's termination, and Plaintiff presented evidence that it did not constitute a "warning" in conformance with the employee handbook. The second "warning" was based on the coaching sessions with Plaintiff which also began more than a year before his termination (although continuing). A reasonable jury, however, could conclude that the coaching did not constitute a "warning" based on Plaintiff's testimony that he was never told that the coaching constituted a warning, and that Defendant's other executives, including Mazur, Seeley, Crum and Blunt, all participated in "coaching." The inference could be drawn that the "coaching" subsequently was recharacterized as a warning to justify Plaintiff's termination. The other two "warnings" did not occur until after Plaintiff informed Mazur about his diagnosis. The facts construed in favor of Plaintiff show that no other discipline of Plaintiff was imposed during the timeframes between the "warnings," that at least some of the "documented" incidents did not occur or did not occur as Defendant's claim they did, and that Plaintiff was not made aware of those other incidents or of the fact that they were inappropriate or put his job in jeopardy. A reasonable jury thus could

conclude that the actions of Defendant were not sufficiently severe to warrant termination until Defendant became aware of Plaintiff's condition.

Other facts taken in the light most favorable to Plaintiff also could reasonably support a finding of pretext. Prior to Plaintiff's disclosure and the final two "warnings," Mazur and Seeley had informed Plaintiff that he was doing everything they expected of him from an interpersonal standpoint, which could weigh against Defendant's position that Plaintiff's lack of success in coaching was a determinative factor. Mazur and Seeley also had suggested that Plaintiff take on a larger role in the company – a role that Plaintiff had expressed interest in and did not refuse to take. According to Plaintiff's version of facts, it was not until Plaintiff disclosed his depression and anxiety to Mazur and others that Mazur determined he was no longer a "fit" for the company in any capacity. Plaintiff was terminated approximately two months after he initially disclosed his condition to Mazur, despite previous indicators of his success and value at the company.

While Defendant's stated reasons ultimately may be found to be the actual basis for Plaintiff's termination, the evidence as presented in this case is sufficient to raise doubt as to Defendant's explanation for its behavior. Thus, summary judgment on the disability discrimination claims is not appropriate.

**B.  FCA Retaliation under 31 U.S.C. § 3730(h)(1)**

The False Claims Act ("FCA") prohibits, among other things, the making of false or fraudulent claims for payment or approval to the United States, or the making of a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a). It allows a civil action to be brought for any violations. 31 U.S.C. § 3730(b). To encourage enforcement of the FCA's provisions, the FCA provides an individual with relief from any retaliatory actions. 31 U.S.C. § 3730(h). Specifically, the FCA provides that:

26

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations . . . .

31 U.S.C. § 3730(h)(1). To establish a claim for retaliatory discharge under the FCA, Plaintiff must show 1) he engaged in protected activity; 2) Defendant knew that Plaintiff engaged in the protected activity; and 3) Defendant discharged Plaintiff because of the protected activity. *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000). Defendant argues that Plaintiff failed to present sufficient evidence to satisfy any of those three elements of his claim. The Court disagrees, finding that sufficient evidence supports each element of the claim to survive summary judgment.

### 1. **Protected Activity**

Protected activity is activity done "in furtherance of an action under [the FCA], or other efforts to stop 1 or more violations[.]" 31 U.S.C. § 3730(h). The term "protected activity" should be interpreted broadly. *McKenzie*, 219 F.3d at 515; *see also United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008). The protected activity, however, must still be related to "exposing fraud" or "involvement with a false claims disclosure." *McKenzie*, 219 F.3d at 516.

Here, there is sufficient evidence from which a reasonable jury could conclude that Plaintiff engaged in protected activity under the FCA. Plaintiff testified that the Dover manager told him that she was instructed by senior management at Defendant to mislead the inspector by providing information that the Dover facility was billing under the number of the Alliance, Ohio facility that was overseeing the Dover facility, even though the Alliance, Ohio facility was not overseeing the Dover facility. Plaintiff further testified that he informed the inspector of what he

27

believed to be fraud by Defendant in billing Medicare under the code of a different supplier who did not actually provide the services and was not overseeing the joint venture. Plaintiff further testified that he consulted a Medicare attorney about the issue. Although Defendant characterizes the incident as a "minor" billing issue, such billing issues potentially could result in a claim under the FCA. *See United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) (holding that a "a claim may be false even if the services billed were actually provided, if the purported provider did not actually render or supervise the service"); *Peterson v. Weinberger*, 508 F.2d 45, 52-54 (5th Cir. 1975), *cert. denied*, 423 U.S. 830 (1975) (holding a defendant liable for submitting false claims where he certified that he rendered the service under his personal supervision but the services actually were rendered by an entity that was not a certified provider). Evidence also shows that Defendant ultimately paid Medicare an amount less than $10,000 to resolve the issue. Defendant's argument that an FCA claim was never filed or that Medicare never investigated further does not preclude Plaintiff from proceeding on his retaliation claim, as a retaliation claim may be maintained even if an FCA action is not successful or is not even filed. *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001) (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. 1998)). Defendant's conclusory statements do not show otherwise. (Doc. 51, PageID 531-532; Doc. 67, PageID 1472).

### 2. Defendant's Knowledge

As for the second prong, the employee must show that the employer had been "put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *Yuhasz v. Bursh Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir. 2003). "The notice to the employer need not explicitly characterize the plaintiff's

concerns as involving false claims against the government, but 'there must be some reason for the employer to suspect that the plaintiff was contemplating a *qui tam* action or was assisting the government in an FCA investigation.'" *United States ex rel. Howard v. Lockheed Martin Corp.*, No. 1:99-cv-285, 2014 U.S. Dist. LEXIS 56818, at * 87 (S.D. Ohio Mar. 25, 2014) (quoting *Kachaylo v. Brookfield Twp. Bd. of Trs.*, 778 F. Supp. 2d 814, 820 (N.D. Ohio 2011)).

Here, although a close call, there is sufficient factual support for the position that Defendant was on notice that Plaintiff was engaging in protected conduct, even if it did not know that Plaintiff consulted with a Medicare attorney. As construed in Plaintiff's favor, Plaintiff connected his disclosures to fraud upon the government by disclosing to the inspector his belief that Defendant was engaging in improper, fraudulent or false billing to Medicare by using an unauthorized supplier number.[24] In response, Defendant eventually made a payment to resolve any issues with Medicare. Mazur also subsequently indicated in notes and to Plaintiff that she did not want Plaintiff talking to the inspector, reflecting her knowledge of Plaintiff's role in reporting the Medicare billing issue to the inspector. While Defendant characterizes its concern about Plaintiff's discussion with the inspector as one relating to Plaintiff's style of communication, there are genuine issues of material fact as to whether the real concern was his style of communication or the content of his communication. Summary judgment on this element of his claim is therefore not appropriate.

### 3. Causation

Genuine factual disputes also preclude summary judgment on the third element of Plaintiff's claim. On this element "'[a]n employee must supply sufficient facts from which a

---

[24] While it appears that a portion of Plaintiff's job involved handling compliance issues, Defendant does not argue it lacked knowledge of Plaintiff's protected activity because the reporting of such information fell within his official duties. As such, the Court assumes here that the reporting of the alleged conduct fell outside his official duties.

reasonable jury could conclude that the employee was discharged [or subjected to a materially adverse employment decision] because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it.'"  *Howard*, 2014 U.S. Dist. LEXIS 56818, at *98 (quoting *McKenzie*, 219 F.3d at 517).  "In order to prove that the action was taken 'because of' the protected activity, the employee must show that the retaliation 'was motivated, at least in part by, the employee's engaging in protected activity.'"  *Howard*, 2014 U.S. Dist. LEXIS 56818, at *98 (quoting *McKenzie*, 219 F.3d at 514 n.4).

While Plaintiff cannot rely on temporal proximity of the purportedly protected activity and his termination alone to establish causation, he has presented additional evidence from which a reasonable jury could find his report to the inspector to be the cause of his termination.  Of particular importance here is that the Discharge Notice Form supporting Plaintiff's termination refers to a "warning" in which Plaintiff was criticized for his disclosure to the inspector and in which Mazur indicated she did not want Plaintiff talking to the inspector.  Plaintiff also presented evidence that construed in his favor shows that he was placed in "coaching" shortly after his disclosure to the inspector and that the coaching eventually became a basis for his termination even though Defendant never suggested that the coaching constituted a warning and had indicated Plaintiff was doing everything expected of him in coaching.  The evidence also may show that Plaintiff was offered a demotion[25] by Defendant prior to his termination and was terminated for purported incidents about which he was never informed.  The evidence also creates doubt, as explained above, as to whether the reasons provided by Defendant for his termination actually occurred and were the true cause of his termination.  The totality of the

---

[25] Although Plaintiff contends the offer was not a demotion, a reasonable jury could conclude the offer was a demotion and that such evidence supports his retaliation claim.

30

evidence presented thus provides a reasonable jury grounds for concluding that Plaintiff's report to the inspector was a cause of his eventual termination.

**IV.**     **CONCLUSION**

Consistent with the foregoing, Defendant's Motion for Summary Judgment (Doc. 51) is **GRANTED IN PART** and **DENIED IN PART**.  It is **ORDERED** that any claim for failure to accommodate under the ADAAA or Ohio Rev. Code § 4112 *et seq.* is **DISMISSED**, while all other claims remain pending.  The case shall proceed as scheduled.

**IT IS SO ORDERED**.

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court

31